*JH*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**FILED**

AUG – 8 2007
*AUG 8 2007*
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| JEROME NEWMAN,<br>on behalf of himself and the classes defined herein, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>)<br>) |
| APEX FINANCIAL GROUP, INC.,<br>doing business as AAPEX MORTGAGE<br>CORPORATION and APPEX DISCOUNT<br>MORTGAGE, INC.; TREVOR YORK;<br>FREMONT INVESTMENT & LOAN,<br>a corporation; EMC MORTGAGE<br>CORPORATION; and MORTGAGE<br>ELECTRONIC REGISTRATION SYSTEMS,<br>INC.; and DOES 1-5, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

**07CV4475
JUDGE DER-YEGHIAYAN
MAG.JUDGE NOLAN**

**JURY DEMANDED**

**COMPLAINT – CLASS ACTION**

**INTRODUCTION**

1.      Plaintiff Jerome Newman brings this action against a mortgage broker, a mortgage lender and the lender's affiliates and assignees to secure redress for discriminatory lending practices, to rescind a mortgage for violation of the Truth in Lending Act ("TILA") and for other violations federal and state law.

**JURISDICTION AND VENUE**

2.      This Court has subject matter jurisdiction under 28 U.S.C. §§1331 (general federal question), 1337 (interstate commerce), 1367 (supplementary jurisdiction), 15 U.S.C. §1640 (TILA), 42 U.S.C. §3613 (Fair Housing Act) and 15 U.S.C. §1691e (Equal Credit

1

Opportunity Act).

      3.     Defendants all transact business in the District and are deemed to reside here.

**PARTIES**

      4.     Plaintiff Jerome Newman jointly owns a home with is mother, Katie Newman, at 5526 West Quincy, Chicago, IL 60644. Jerome Newman resides in the home with his wife and children.

      5.     Plaintiff is African-American.

      6.     Defendant Apex Financial Group, Inc., doing business as Aapex Mortgage Corporation and Apex Discount Mortgage, Inc. ("Apex"), is a Florida corporation with offices at 801 W. Bloomingdale Avenue, Brandon, FL 33511. It does business in Illinois. Its registered agent and office are Illinois Corporation Service Co., 801 Adlai Stevenson Dr., Springfield, IL 62703. It is engaged in the business of a mortgage broker.

      7.     Trevor York was or is an employee or other associate of Apex. He does business in Illinois. His whereabouts is presently unknown.

      8.     Defendant Fremont Investment & Loan, a corporation ("Fremont"), is a California corporation with its principal place of business in California. It is engaged in the business of originating mortgages. It does business in Illinois. Its registered agent and office are CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604.

      9.     Defendant EMC Mortgage Corporation ("EMC") is a Delaware Corporation with its principal place of business at 800 E. Highway 121, Lewisville, TX, 75057-4115. It is engaged in the business of, among other things, servicing mortgage loans. It does

2

business in Illinois. Its registered agent and office are CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604.

10.  Defendant Mortgage Electronic Registration Systems, Inc. ("MERS"). is a corporation that holds title to mortgages. It does business in Illinois. Its registered agent and office are CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, Illinois 60604. MERS holds title to the mortgage that resulted from the transaction complained of herein. MERS thus claims rights with respect to the transaction at issue herein and is a party necessary to be joined if feasible.

### FACTS RELATING TO PLAINTIFFS

11.  Prior to November 28, 2006, plaintiff requested that a mortgage broker, Trevor York, obtain refinancing for him. Trevor York had previously procured refinancing for Katie Newman's other properties, and Jerome Neuman trusted him.

12.  Trevor York was or purported to be employed by defendant Apex.

13.  Apex submitted a loan application on behalf of plaintiff to defendant Fremont.

14.  Plaintiff needed and used the loan for personal, family or household purposes, namely, refinancing of prior debt incurred for such purposes.

15.  Apex and/or York asked for and were provided with information and supporting documentation concerning plaintiff's property, income and other pertinent matters.

16.  Plaintiff then received a package in the mail containing preliminary disclosures for the loan. They indicated a loan of slightly more than $200,000. Plaintiff asked why the loan amount was so high when his mother only owed approximately $137,000 on the

3

home. Mr. York mentioned that the difference was for "fees, closing costs and other expenses."

17. Fremont then originated a loan to plaintiff and his mother in the amount of $205,000. The loan documents are dated as if they loan were closed on November 28, 2006, although such date is not accurate.

18. The following are documents relating to the loan:

    a. A note in favor of Fremont, Exhibit A;

    b. A mortgage in favor of MERS, Exhibit B, executed by Jerome and Katie Newman;

    c. A Truth in Lending disclosure statement, Exhibit C;

    d. An itemization of amount financed, Exhibit D; and

    e. Three different settlement statements, Exhibits E-G. All were dated November 28, 2006.

19. One settlement statement (Exhibit E) shows a payment of $10,294.39 to the borrowers and $6,908.73 for payment of back real estate taxes  Another (Exhibit F) shows a payment of $3,385.66 to the borrowers and $13,817.46 for back taxes. Another (Exhibit G) shows a payment of $3,401.66 to the borrowers and $13,817.46 for back taxes. None shows the actual disbursement of the loan.

20. About four days after closing, plaintiff received from Mr. York a check for loan proceeds in the amount of $3,385.66.

21. On information and belief, about $13,817.46 of the loan proceeds were withheld on account of the back real estate taxes, but the taxes were only $6,895.73. About a week following closing and after plaintiff complained to Mr. York, the latter sent a revised HUD-

4

1 to plaintiff for plaintiff to sign. Then, the sum of $6,908.73 was refunded to plaintiffs.

22.    Additionally, all of the settlement statements show a payment of $42,701.06, supposedly for payoff of a "second mortgage," to "Real Properties LLC." In fact, no second mortgage existed, and, on information and belief, York and/or Apex controlled or were affiliated with "Real Properties LLC," which was involuntarily dissolved by the Illinois Secretary of State in 2004.

23.    On information and belief, the $42,701.06 disbursement was actually made or directed to York and Apex for mortgage brokerage services.

24.    When plaintiff questioned York about $42,701.06 after closing, York claimed that the payment was for his services in "cleaning up" plaintiff's and his wife's credit. Trevor never provided any services to plaintiff or his wife other than mortgage loan brokerage services.

25.    In addition to this disguised payment for brokerage services, all of the settlement statements disclose payments from the loan proceeds of $4,892 (lines 804, 809, and 810) to Apex for brokerage services, in addition to the $42,701.06 referred to above.

26.    The various HUD-1s also show that Apex received a $4,100 payment from Fremont as a "yield spread premium."

27.    All of the settlement statements show a payment of $500 of the proceeds for an appraisal, but this was in fact paid separately and prior to the closing.

28.    Furthermore, the actual loan terms were not made known to plaintiff until after the date appearing on the loan documents.

29.    On information and belief, plaintiff was not given the required three

business days in which to cancel the loan and was not provided with any notice of his federal right to cancel the loan.

30.    The amount of broker compensation and other finance charges was over 20% of the amount of the loan. All compensation paid to mortgage brokers is a finance charge for purposes of TILA, 15 U.S.C. §1605. The TILA disclosure (Exhibits C and D) furnished to plaintiff did not include the $42,701.06 paid to "Real Properties LLC" as part of the disclosed finance charge.

31.    Inclusion of the $42,701.06 in the finance charge would also have resulted in the "points and fees" for the loan openly exceeding the 8% that triggers application of the Home Ownership and Equity Protection Act ("HOEPA") amendment to TILA, 15 U.S.C. §§1602(aa) and 1639, and corresponding provisions of Regulation Z, which required the provision of special disclosure forms in advance of closing. No such disclosures were made to plaintiff. B.

32.    Inclusion of the $42,701.06 in the finance charge would also have resulted in the loan being openly subject to the Illinois High Risk Home Loan Act, 815 ILCS 137/1 ("HRHLA"). The HRHLA defines a "high risk home loan" as "a home equity loan in which . . . (ii) the total points and fees payable by the consumer at or before closing will exceed the greater of 5% of the total loan amount or $800... ." 815 ILCS 137/10. "Points and fees" include anything that is defined as "points and fees" under HOEPA.

33.    The loan does not comply with the HRHLA, in that 815 ILCS 137/55 provides that "[n]o lender shall transfer, deal in, offer, or make a high risk home loan that finances points and fees in excess of 6% of the total loan amount." All of the $42,701.06

received by "Real Properties LLC" was financed.

34.    Like HOEPA, the HRHLA also imposes advance disclosure requirements, 815 ILCS 137/95. No such disclosures were made to plaintiff.

35.    On information and belief, Fremont owns plaintiff's loan.

36.    Plaintiffs are making payments to EMC Mortgage Corporation, which claims the right to payments under the loan.

37.    In the event Fremont does not own plaintiff's loan, the actual owners or holders are named as Does 1-5.

38.    The sum of $4,892 was more than reasonable compensation to Apex for brokerage services.

39.    The total compensation of received by Apex (over 20% of the loan) was exorbitant and unreasonable.

40.    A "yield spread premium" is a payment by a lender to a broker based on the extent to which the interest rate or other terms of the loan exceeds a "par" rate. For example, if the mortgage broker gets the borrower to accept an interest rate on the loan that is .50% above "par," then the lender will pay a "yield spread premium" of, e.g., 0.5% of the principal amount of the loan to the broker.

41.    The lender's payment of a YSP and the broker's corresponding imposition of more onerous loan terms are unrelated to the borrower's creditworthiness.

42.    Yield spread premiums disproportionately impact minority borrowers such as plaintiff. This result is known and intended by defendants.

43.    As a result of defendants' conduct, plaintiff was induced to sign loan

7

documents providing for a loan that was unnecessarily expensive and which was made on less

favorable terms than loans made to Caucasian individuals.

## COUNT I – FAIR HOUSING ACT

44.    Plaintiff incorporates paragraphs 1-43.

45.    The Fair Housing Act, 42 U.S.C. §3605, provides:

**Discrimination in residential real estate-related transactions**

**(a) In general. It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.**

**(b) "Residential real estate-related transaction" defined. As used in this section, the term "residential real estate-related transaction" means any of the following:**

> **(1) The making or purchasing of loans or providing other financial assistance--**
>
> > **(A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or**
> >
> > **(B) secured by residential real estate.**
>
> **(2) The selling, brokering, or appraising of residential real property.**

**(c) Appraisal exemption. Nothing in this title prohibits a person engaged in the business of furnishing appraisals of real property to take into consideration factors other than race, color, religion, national origin, sex, handicap, or familial status.**

46.    Defendants Fremont and Apex violated the Fair Housing Act by paying

and receiving, respectively, higher yield spread premiums with respect to loans made to minority

borrowers, which necessarily impacts the rates charged to such borrowers.

47.    The Fair Housing Act, 42 U.S.C. §3613, provides:

**§ 3613.  Enforcement by private persons**

**(a) Civil action.**

    **(1) (A) An aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice, or the breach of a conciliation agreement entered into under this title, whichever occurs last, to obtain appropriate relief with respect to such discriminatory housing practice or breach. . . .**

**(c) Relief which may be granted.**

    **(1) In a civil action under subsection (a), if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages, and subject to subsection (d), may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).**

    **(2) In a civil action under subsection (a), the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee and costs. The United States shall be liable for such fees and costs to the same extent as a private person. . . .**

## CLASS ALLEGATIONS

48.    Plaintiff brings this claim on behalf of two classes, Apex and Fremont.

49.    The Apex  class consists of (a) all African-American and Hispanic persons with Illinois addresses, (b) who obtained a loan from any lender through Apex Mortgage Corporation, (c) and paid Apex Mortgage Corporation direct compensation of not less than 1% of the loan principal or $2,000, whichever is greater, (d) where Apex Mortgage Corporation received a yield spread premium of not less than 1% of the loan principal or $2,000, whichever is

9

greater, (e) where the loan was closed on or after a date two years prior to the filing of this action.

50.    The Fremont class consists of (a) all African-American and Hispanic persons with Illinois addresses, (b) who obtained a loan from Fremont through a broker, (c) which broker was paid direct compensation of not less than 1% of the loan principal or $2,000, whichever is greater, (d) where Fremont paid the broker a yield spread premium of not less than 1% of the loan principal or $2,000, whichever is greater, (e) where the loan was closed on or after a date two years prior to the filing of this action.

51.    Each class is so numerous that joinder is impracticable. On information and belief, there are more than 50 members of the class.

52.    There are questions of law and fact common to the members of the class, which common questions predominate over any questions that affect only individual class members. The predominant common question is whether the payment and receipt of yield spread premiums results in loan terms which are intended to discriminate or have the effect of discriminating against African-American and Hispanic borrowers.

53.    Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

54.    Plaintiff will fairly and adequately represent the interests of the class members. Plaintiff has retained counsel experienced in consumer credit cases.

55.    A class action is superior to other alternative methods of adjudicating this dispute. Individual cases are not economically feasible. The nature of the claim is such that proof of the class-wide impact of yield spread premiums is necessary.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of

10

plaintiff and the classes and against defendants for:

      a.     Appropriate actual and punitive damages;

      b.     Rescission or reformation of plaintiff's loan;

      c.     Injunctive relief;

      d.     Attorney's fees, litigation expenses and costs; and

      e.     Such other or further relief as the Court deems appropriate.

## COUNT II – EQUAL CREDIT OPPORTUNITY ACT

56.     Plaintiff incorporates paragraphs 1-43.

57.     The Equal Credit Opportunity Act, 15 U.S.C. §1691, provides:

**(a) Activities constituting discrimination. It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction--**

    **(1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract) . . .**
    **.**

58.     Defendants Fremont and Apex violated the ECOA.

59.     The Equal Credit Opportunity Act, 15 U.S.C. §1691e, further provides:

**Civil liability**

**(a) Individual or class action for actual damages. Any creditor who fails to comply with any requirement imposed under this title shall be liable to the aggrieved applicant for any actual damages sustained by such applicant acting either in an individual capacity or as a member of a class.**

**(b) Recovery of punitive damages in individual and class action for actual damages; exemptions; maximum amount of punitive damages in individual actions; limitation on total recovery in class actions; factors determining amount of award. Any creditor, other than a government or governmental subdivision or agency, who fails to comply with any requirement imposed under this title shall be liable to the aggrieved applicant for punitive damages**

in an amount not greater than $ 10,000, in addition to any actual damages provided in subsection (a), except that in the case of a class action the total recovery under this subsection shall not exceed the lesser of $ 500,000 or 1 per centum of the net worth of the creditor. In determining the amount of such damages in any action, the court shall consider, among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional.

(c) Action for equitable and declaratory relief. Upon application by an aggrieved applicant, the appropriate United States district court or any other court of competent jurisdiction may grant such equitable and declaratory relief as is necessary to enforce the requirements imposed under this title.

(d) Recovery of costs and attorney fees. In the case of any successful action under subsection (a), (b), or (c), the costs of the action, together with a reasonable attorney's fee as determined by the court, shall be added to any damages awarded by the court under such subsection. . . .

(f) Jurisdiction of courts; time for maintenance of action; exceptions. Any action under this section may be brought in the appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction. No such action shall be brought later than two years from the date of the occurrence of the violation . . . .

## CLASS ALLEGATIONS

60.    Plaintiff brings this claim on behalf of two classes, Apex and Fremont.

61.    The Apex class consists of (a) all African-American and Hispanic persons with Illinois addresses, (b) who obtained a loan from any lender through Apex, (c) and paid Apex direct compensation of not less than 1% of the loan principal or $2,000, whichever is greater, (d) where Apex received a yield spread premium of not less than 1% of the loan principal or $2,000, whichever is greater, (e) where the loan was closed on or after a date two years prior to the filing of this action.

62.    The Fremont class consists of (a) all African-American and Hispanic

12

persons with Illinois addresses, (b) who obtained a loan from Fremont through a broker, (c) which broker was paid direct compensation of not less than 1% of the loan principal or $2,000, whichever is greater, (d) where Fremont paid the broker a yield spread premium of not less than 1% of the loan principal or $2,000, whichever is greater, (e) where the loan was closed on or after a date two years prior to the filing of this action.

63.    Each class is so numerous that joinder is impracticable.  On information and belief, there are more than 50 members of the class.

64.    There are questions of law and fact common to the members of the class, which common questions predominate over any questions that affect only individual class members. The predominant common question is whether the payment and receipt of yield spread premiums results in loan terms which are intended to discriminate or have the effect of discriminating against Hispanic or African-American borrowers.

65.    Plaintiff's claim is typical of the claims of the class members.  All are based on the same factual and legal theories.

66.    Plaintiff will fairly and adequately represent the interests of the class members. Plaintiff has retained counsel experienced in consumer credit cases.

67.    A class action is superior to other alternative methods of adjudicating this dispute.  Individual cases are not economically feasible.  The nature of the claim is such that proof of the class-wide impact of yield spread premiums is necessary.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and the classes and against defendants for:

a.    Appropriate damages;

13

    b.    Rescission or reformation of plaintiff's loan;

    c.    Injunctive relief;

    d.    Attorney's fees, litigation expenses and costs; and

    e.    Such other or further relief as the Court deems appropriate.

## COUNT III – ILLINOIS CONSUMER FRAUD ACT

68.    Plaintiff incorporates paragraphs 1-43.

69.    Defendants Apex, Fremont and Trevor York engaged in deceptive and unfair practices, in violation of §2 of the Illinois Consumer Fraud Act, 815 ILCS 505/2, by, among other things:

    a.    Paying (Fremont) and receiving (Apex) an excessive and unreasonable yield spread premium and other broker compensation;

    b.    Knowingly and fraudulently imposing, disguising and pocketing plaintiff's loan proceeds in the amount of $42,701.06;

    c.    Having plaintiff sign and certify that the statements in HUD-1 Settlements Statements they signed were true, thereby putting plaintiff at risk of prosecution; and

    d.    Misrepresenting the finance charge, amount financed and annual percentage rate by failing to include the additional $42,701.06 in broker compensation and points and fees.

70.    In addition, the HRHLA, 815 ILCS 137/135(b), provides that "Any knowing violation of this Act constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act." Defendants knew or should have known of the fraudulent payment to "Real Properties LLC."

14

71.     Defendants knowingly violated the HRHLA by omitting the payment to "ACS" from the finance charge, thereby concealing the fact that they were making a loan subject to the HRHLA, by financing broker compensation exceeding 6%, in violation of the HRHLA, and by failing to provide the special advance disclosures required by the HRHLA.

72.     Defendants engaged in such conduct in the course of trade and commerce.

73.     Defendants engaged in such conduct with the intent to induce plaintiff to rely on their unfair and/or deceptive acts.

74.     Plaintiff was damaged as a result.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendants for:

    a.     Appropriate damages;

    b.     Rescission or reformation of plaintiff's loan;

    c.     Injunctive relief;

    d.     Attorney's fees, litigation expenses and costs; and

    e.     Such other or further relief as the Court deems appropriate.

### COUNT IV – TILA

75.     Plaintiff Jerome Newman incorporates paragraphs 1-43.

### RIGHT TO RESCIND

76.     Because the transaction was secured by plaintiff's home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by 15 U.S.C. §1635 and 12 C.F.R. §226.23. Section 226.23 provides:

(a) <u>Consumer's right to rescind.</u>

> (1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.[fn]47

> (2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.

> (3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act. [15 U.S.C. §1635(f)]

> (4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.

(b) <u>Notice of right to rescind.</u> In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:

> (1) The retention or acquisition of a security interest in the consumer's principal dwelling.

> (2) The consumer's right to rescind the transaction.

> (3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

> (4) The effects of rescission, as described in paragraph (d) of this

section.

(5) The date the rescission period expires. . . .

(f) **Exempt transactions.** The right to rescind does not apply to the following:

(1) A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].

(2) A credit plan in which a state agency is a creditor.

## GROUNDS FOR RESCISSION

77.    In connection with the loan, Fremont failed to provide: (a) the required disclosures of the plaintiff's federal right to cancel within three days, in violation of 15 U.S.C. §1635 and 12 C.F.R. §226.23; (b) the required financial disclosures, in violation of 15 U.S.C. §1637 and 12 C.F.R. §226.18; and ( c) the advance disclosures required by 15 U.S.C. §§ 1602(aa), §1639, and corresponding provisions of Regulation Z

78.    Notice of rescission has been given to defendants.

79.    Under 15 U.S.C. §1641(c), the right to rescind may be exercised against any assignee.

80.    15 U.S.C. §1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendants for:

17

a.    A judgment voiding plaintiff's mortgage, capable of recordation in the public records, and binding on defendants;

b.    Statutory damages, including the enhanced HOEPA damages, for the underlying disclosure violations by Fremont;

c.    If appropriate, statutory damages for failure to rescind;

d.    Attorney's fees, litigation expenses and costs; and

e.    Such other or further relief as the Court deems appropriate.

## COUNT V – CREDIT REPAIR ORGANIZATIONS ACT

81.    Plaintiff incorporates paragraphs 1-43.

82.    This claim is against York and Apex.

83.    York and Apex violated the CROA by misrepresenting on the HUD-1 Settlement Statement and elsewhere that plaintiff had and was paying off a second mortgage.

84.    CROA § 1679b provides:

**1679b. Prohibited practices**

**(a) In general. No person may--**

**(1) make any statement, or counsel or advise any consumer to make any statement, which is untrue or misleading (or which, upon the exercise of reasonable care, should be known by the credit repair organization, officer, employee, agent, or other person to be untrue or misleading) with respect to any consumer's credit worthiness, credit standing, or credit capacity to-- . . .**

**(B) any person--**

**(i) who has extended credit to the consumer; or**

**(ii) to whom the consumer has applied or is applying for an extension of credit . . . .**

18

85.    CROA § 1679g provides:

**1679g. Civil liability**

**(a) Liability established. Any person who fails to comply with any provision of this title [15 USC §§1679 et seq.] with respect to any other person shall be liable to such person in an amount equal to the sum of the amounts determined under each of the following paragraphs:**

**(1) Actual damages. The greater of--**

**(A) the amount of any actual damage sustained by such person as a result of such failure . . . .**

**(2) Punitive damages.**

**(A) Individual actions. In the case of any action by an individual, such additional amount as the court may allow. . . .**

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and Apex and York for:

a.    Compensatory and punitive damages;

b.    Attorney's fees, litigation expenses and costs; and

c.    Such other or further relief as the Court deems appropriate.

## COUNT VI -- BREACH OF FIDUCIARY DUTY

86.    Plaintiff incorporates paragraphs 1-43.

87.    This claim is against Apex and York.

88.    One who undertakes to find and arrange financing for another becomes the latter's agent for that purpose and owes a fiduciary duty to act in the interest of the principal and to make full disclosure of all material facts.

89.    Apex and York undertook to serve as plaintiff's mortgage broker and

became his agent(s) for this purpose.

90.    Apex and York engaged in conduct that was fraudulent and adverse to the interest of plaintiff and that was contrived to obtain substantial compensation for themselves, including:  disguising and pocketing $42,701.06 of plaintiff's loan proceeds; having plaintiff sign and certify that the statements in HUD-1 Settlements Statements they signed were true, thereby putting plaintiff at risk of prosecution; and arranging and accepting excessive broker compensation and accepting a yield spread premium.

91.    By these and others acts, defendants violated their fiduciary duty as mortgage broker.

92.    Plaintiff was damaged as a result.

93.    The conduct of defendants was deliberately oppressive, corrupt and dishonest.  Substantial punitive damages are warranted.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendants for:

a.    Compensatory and punitive damages;

b.    Costs; and

c.    Such other or further relief as the Court deems appropriate.

_____
Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs

20

James O. Latturner
Tara L. Goodwin
Al Hofeld, Jr.
EDELMAN, COMBS, LATTURNER
      & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)


## **JURY DEMAND**

Plaintiff demands trial by jury.

                             Daniel A. Edelman

# EXHIBIT A

# ADJUSTABLE RATE NOTE
### (6-Month LIBOR Index - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

November 28, 2006                           BREA                                   CA    92821
[Date]                                      [City]                                 [State]

5526 W QUINCY STREET, Chicago, IL  60644

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 205,000.00                    (this amount is called " Principal"), plus interest, to the order of the Lender. The Lender is  Fremont Investment & Loan

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of       9.350 %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the first day of each month beginning on  January 01, 2007 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  December 01, 2036           , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  2727 East Imperial Highway, Brea, CA  92821

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ 1,701.36         . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**MULTISTATE ADJUSTABLE RATE NOTE - 6-Month LIBOR Index  - Single Family -Freddie Mac UNIFORM INSTRUMENT**

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of December, 2008 , and may change on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the six month London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for six-month U.S. dollar-denominated deposit in the London market, as published in *The Wall Street Journal*. The most recent Index figure available 45 days first before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Six and 927/1000 percentage point(s) ( 6.927 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 12.350 % or less than 9.350 %. Thereafter, my interest rate will never be increased or decreased on any subsequent Change Date by more than 1.500 from the rate of interest I have been paying for the preceding period. My interest rate will never be greater than 15.350 % or less than 9.350 %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

Form 5520 3/04
Initials: _____

 -815N (0404)

## 7.  BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000 %** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver by Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8.  GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

# EXHIBIT B

Return To:

Fremont Investment & Loan
P.O. BOX 34078
FULLERTON, CA 92834-34078

Prepared By:

Barbara Licon

30000000695497
——————————————————[Space Above This Line For Recording Data]——————————————————

# MORTGAGE

MIN 1001944-3000695497-1

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated November 28, 2006 together with all Riders to this document.

**(B) "Borrower"** is KATIE B. NEWMAN and JEROME NEWMAN

Borrower is the mortgagor under this Security Instrument.

**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

ILLINOIS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS    Form 3014 1/01

VMP®-6A(IL) (0010).01
Page 1 of 15                    Initials: _____

VMP MORTGAGE FORMS - (800)521-7291

**(D) "Lender"** is Fremont Investment & Loan

Lender is a        CORPORATION
organized and existing under the laws of        CALIFORNIA
Lender's address is 2727 East Imperial Highway, Brea, CA   92821

**(E) "Note"** means the promissory note signed by Borrower and dated November 28, 2006
The Note states that Borrower owes Lender Two Hundred Five Thousand  and 0/100ths
                                                                        Dollars
(U.S. $ 205,000.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than December 01, 2036
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [X] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the
County                                                                                            [Type of Recording Jurisdiction]
of Cook                                                                                        [Name of Recording Jurisdiction]:
SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART THEREOF

Parcel ID Number: 16-16-106-038                                which currently has the address of
5526 W QUINCY STREET                                                                                  [Street]
Chicago                                              [City], Illinois 60644                        [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items

-6A(IL) (0010).01                               Page 3 of 15                    Initials:_____                Form 3014  1/01

pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

-6A(IL) (0010).01                                Page 6 of 15

Initials: _____

Form 3014   1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

-6A(IL) (0010).01

Initials: _____

Form 3014   1/01

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.



NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

25. **Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
KATIE B. NEWMAN                                         -Borrower


_____

_____ (Seal)
JEROME NEWMAN                                          -Borrower


_____ (Seal)          _____ (Seal)
                        -Borrower                                                -Borrower


_____ (Seal)          _____ (Seal)
                        -Borrower                                                -Borrower


_____ (Seal)          _____ (Seal)
                        -Borrower                                                -Borrower

# ADJUSTABLE RATE RIDER

THIS ADJUSTABLE RATE RIDER is made this 28th    day of November, 2006          ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
Fremont Investment & Loan

(the "Lender") of the same date and covering the Property described in the Security
Instrument and located at: 5526 W QUINCY STREET, Chicago, IL  60644

[Property Address]

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY
INTEREST RATE AND MY MONTHLY PAYMENT. INCREASES IN THE
INTEREST RATE WILL RESULT IN HIGHER PAYMENTS. DECREASES IN THE
INTEREST RATE WILL RESULT IN LOWER PAYMENTS.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of          9.350 %. The Note provides
for changes in the interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
   **(A) Change Dates**
The interest rate I will pay may change on the first day of December, 2008          ,
and on that day every    sixth      month thereafter. Each date on which my interest rate
could change is called a "Change Date."

**MULTISTATE ADJUSTABLE RATE RIDER** - Single Family

**⊗-899R** (0402)          **1/01**
Page 1 of 5        Initials: _____
VMP Mortgage Solutions, Inc.
(800)521-7291

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is:  the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in the WALL STREET JOURNAL.

The most recent Index figure available as of the date:  [X] 45 days  [ ] _____ before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Six and 927/1000                                                                percentage points
(          6.927 %) to the Current Index. The Note Holder will then round the result of this addition to the  [X] Nearest  [ ] Next Highest  [ ] Next Lowest
one-eighth of one percent point                    (              0.125 %). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

[ ] **Interest-Only Period**

The "Interest-only Period" is the period from the date of this Note through
          N/A          . For the interest-only period, after calculating my new interest rate as provided above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to pay the interest which accrues on the unpaid principal of my loan. The result of this calculation will be the new amount of my monthly payment.

The "Amortization Period" is the period after the interest-only period. For the amortization period, after calculating my new interest rate as provided above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

Initials: _____

**(D) Limits on Interest Rate Changes**
**(Please check appropriate boxes; if no box is checked, there will be no maximum limit on changes.)**

☐ (1) There will be no maximum limit on interest rate changes.

☒ (2) The interest rate I am required to pay at the first Change Date will not be greater than                12.350 % or less than                9.350 %.

☒ (3) My interest rate will never be increased or decreased on any subsequent Change Date by more than One and 500/1000 percentage points (                1.5 %) from the rate of interest I have been paying for the preceding period.

☒ (4) My interest rate will never be greater than                15.350 %, which is called the "Maximum Rate."

☒ (5) My interest rate will never be less than                9.350%, which is called the "Minimum Rate."

☒ (6) My interest rate will never be less than the initial interest rate.

☒ (7) The interest rate I am required to pay at the first Change Date will not be greater than                12.350 % or less than                9.350 %. Thereafter, my interest rate will never be increased or decreased on any subsequent Change Date by more than One and 500/1000 percentage points (                1.5 %) from the rate of interest I have been paying for the preceding period.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

Initials: _____

-899R (0402)                    Page 3 of 5

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

VMP-899R (0402)                    Page 4 of 5

Initials: _____

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)      _____ (Seal)
KATIE B. NEWMAN      -Borrower    JEROME NEWMAN      -Borrower

_____ (Seal)      _____ (Seal)
-Borrower       -Borrower

_____ (Seal)      _____ (Seal)
-Borrower       -Borrower

_____ (Seal)      _____ (Seal)
-Borrower       -Borrower

VMP-899R (0402)       Page 5 of 5

# 1-4 FAMILY RIDER
## (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this 28th    day of November, 2006    ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure Borrower's Note to Fremont Investment & Loan

(the
"Lender") of the same date and covering the Property described in the Security Instrument
and located at: 5526 W QUINCY STREET, Chicago, IL 60644

[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to
the Property described in the Security Instrument, the following items now or hereafter
attached to the Property to the extent they are fixtures are added to the Property description,
and shall also constitute the Property covered by the Security Instrument: building materials,
appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or
intended to be used in connection with the Property, including, but not limited to, those for
the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light,
fire prevention and extinguishing apparatus, security and access control apparatus, plumbing,
bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers,
disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades,
curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings,
all of which, including replacements and additions thereto, shall be deemed to be and remain
a part of the Property covered by the Security Instrument. All of the foregoing together with
the Property described in the Security Instrument (or the leasehold estate if the Security
Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security
Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or
make a change in the use of the Property or its zoning classification, unless Lender has
agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations
and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow
any lien inferior to the Security Instrument to be perfected against the Property without
Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in
addition to the other hazards for which insurance is required by Section 5.

**MULTISTATE 1- 4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
**Form 3170 1/01**

(VMP®)-57R (0411)
Page 1 of 3        Initials:_____
VMP Mortgage Solutions, Inc.
(800)521-7291

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_____ (Seal)        _____ (Seal)
KATIE B. NEWMAN                   -Borrower      JEROME NEWMAN                     -Borrower

_____ (Seal)        _____ (Seal)
                                 -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                                 -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                                 -Borrower                                        -Borrower

VMP-57R (0411)                   Page 3 of 3                   Form 3170 1/01

# EXHIBIT C

## TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)
For use with Adjustable Rate Mortgage Loans

LENDER OR LENDER'S AGENT:
Fremont Investment & Loan
2727 East Imperial Highway, Brea, CA  92821

☐ Preliminary  [X] Final
DATE: 11/28/2006
LOAN NO.: 30000000695497
Type of Loan: Conventional

BORROWERS: KATIE B. NEWMAN and JEROME NEWMAN

PROPERTY: 5526 W QUINCY STREET, Chicago, IL  60644

Disclosures are estimates based on an anticipated funding date of     11/28/2006 .

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 12.163% | $ 567,613.39 | $ 197,117.97 | $ 764,731.36 |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE Monthly BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE Monthly BEGINNING |
|---|---|---|---|---|---|
| 24 | $1,701.36 | 1/1/2007 | | | |
| 335 | $2,154.44 | 1/1/2009 | | | |
| 1 | $2,161.32 | 12/1/2036 | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**DEMAND FEATURE:**  [X]  This loan does not have a Demand Feature.  ☐  This loan has a Demand Feature as follows:

**VARIABLE RATE FEATURE:**
[X]  This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

**INSURANCE:**  The following is required to obtain credit:
[X] Property Insurance   ☐ Flood Insurance
You may obtain the insurance from anyone you want that is acceptable to the creditor.

**SECURITY:**  You are giving a security interest in:
☐ The property being purchased, including fixtures, leases, and rents derived from the property.
[X] The property you already own, including fixtures, leases and rents derived from the property.

**ASSUMPTION:**  Someone buying your home
[X] may, subject to conditions, be allowed to assume the remainder of the mortgage on the original terms.
☐ cannot assume the remainder of the mortgage on the original terms.

**LATE CHARGES:**  If your payment is more than  15   days late, you will be charged a late charge of      5.000 % of the overdue payment.

**PREPAYMENT:**  If you pay off your loan early, you
☐ may  [X] will not      have to pay a penalty.
☐ may  [X] will not      be entitled to a refund of part of the finance charge.

**See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.**
**e means estimate**

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____
KATIE B. NEWMAN                    BORROWER/DATE

JEROME NEWMAN                    BORROWER/DATE

_____
BORROWER/DATE

_____
BORROWER/DATE

# EXHIBIT D

Lender:  Fremont Investment & Loan          Applicant(s): KATIE B. NEWMAN and JEROME NEWMAN

Address: 2727 East Imperial Highway
         Brea, CA  92821

Date: 11/28/2006                  Property Address:   5526 W QUINCY STREET
Application: 30000000695497                           Chicago, IL  60644

**LOAN AMOUNT** $ 205,000.00        Mailing Address:   5522 W QUINCY STREET
                                                       Chicago, IL  60644

## ITEMIZATION OF AMOUNT FINANCED

| Ref. HUD - 1 Statement | | | | | | |
|---|---|---|---|---|---|---|
| 1000's | Amount paid on your account: | | | | | |
| 1000's | Hazard Insurance Premium Reserves | mo @ $ | $ | | | |
| 1000's | Flood Insurance Premium Reserves | mo @ $ | $ | | | |
| 1000's | Tax & Assessment Reserves | mo @ $ | $ | | | |
| 1000's | City Tax Reserves | mo @ $ | $ | | | |
| 1000's | | mo @ $ | $ | | | |
| 1000's | | mo @ $ | $ | | | |
| 1000's | | mo @ $ | $ | | | |
| | | | | | PAID | DUE |
| 800's | Amount paid to others on your behalf: | | | | | |
| | Appraisal Fees to Appraiser | | | | 500.00 | 0.00 |
| 800's | Credit Reporting Fees | | | | | 0.00 |
| 900's | Hazard Insurance Premiums to Insurance Agency | | | | | 0.00 |
| 900's | Flood Insurance Premiums to Insurance Agency | | | | | |
| | Notary Fee to: | | | | | |
| 1100's | Title Insurance Premiums to: Ticor Title Insurance Company | | | | | 1,000.00 |
| 1200's | Filing Fees to Public Officials/ Recording Fees | | | | | 100.00 |
| | Loan Proceeds to: Ticor Title Insurance Company | | | $ | | 198,867.97 |
| | AMOUNT FINANCED | | | $ | | 197,117.97 |
| | Prepaid Finance Charge | | | $ | | 7,882.03 |

| Ref. | Itemization of Prepaid Finance Charge: | LENDER | BROKER * | OTHER | POC |
|---|---|---|---|---|---|
| 800's | Lender Orig. Fee | | | | |
| 800's | Loan Discount    ( N/A %) | | | | |
| 900's | Prepaid Interest (  3   Days ) | 157.53 | | | |
| | @ $   52.51   per day | | 11.00 | | |
| 800's | Credit Rpt Fee | 1,018.00 | | | |
| 800's | Underwriting Fee | 48.00 | | | |
| 800's | Tax Service Fee - LandAmerica | | | | |
| | Tax and Flood Services | | | | |
| 800's | Flood Cert Fee - LandAmerica | 7.50 | | | |
| | Tax and Flood Services | | | | |
| 800's | Processing Fee | | 495.00 | | |
| 800's | Application Fee | | 295.00 | | |
| 800's | Broker Fee | | 4,100.00 | | |
| 1100's | Esc./Closing Agent Fee | | | 1,000.00 | |
| 1100's | Atty Fee | | | 750.00 | |
| | Prepaid Finance Charge | 1,231.03 | 4,901.00 | 1,750.00 | 0.00 |
| | Total Prepaid Finance Charge   $          7,882.03 | | | | |

If your loan is prepaid before the maturity date, the loan fees and other similar charges will not be subject to any refund.

*    AAPEX MORTGAGE CORPORATION

I/ We hereby acknowledge receipt of this itemization of amount financed, and authorize direct disbursement as set forth.

| | | | |
|---|---|---|---|
| Applicant  KATIE B. NEWMAN | Date | Applicant  JEROME NEWMAN | Date |
| Applicant | Date | Applicant | Date |
| Applicant | Date | Applicant | Date |
| Applicant | Date | Applicant | Date |

**FREMONT**
INVESTMENT & LOAN

# EXHIBIT E

| A. | | B. TYPE OF LOAN: | | | | |
|---|---|---|---|---|---|---|
| | | 1. ☐ FHA | 2. ☐ FmHA | 3. ☒ CONV. UNINS. | 4. ☐ VA | 5. ☐ CONV. INS. |

**U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT**

**SETTLEMENT STATEMENT**

| 6. FILE NUMBER: TTC06-07892 | 7. LOAN NUMBER: 30000006695497 |
|---|---|
| 8. MORTGAGE INS CASE NUMBER: | |

C. NOTE:  *This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "[POC]" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.*
1.0  3/98   (TTC06-07892.PFD/TTC06-07892/47)

| D. NAME AND ADDRESS OF BORROWER: | E. NAME AND ADDRESS OF SELLER: | F. NAME AND ADDRESS OF LENDER: |
|---|---|---|
| KATIE B NEWMAN and JEROME NEWMAN 5526 W QUINCY ST CHICAGO, ILLINOIS 60644 | | FREMONT INVESTMENT & LOAN 555 TAXTER RD , SUITE 220 ELMSFORD, NY 10523 |

| G. PROPERTY LOCATION: | H. SETTLEMENT AGENT: | I. SETTLEMENT DATE: |
|---|---|---|
| 5526 W QUINCY ST CHICAGO, IL 60644 COOK County, Illinois | Tristar Title, LLC  PLACE OF SETTLEMENT 1919 S. Highland Ave. Bldg BSte. 330 Lombard, Illinois 60148 | November 28, 2006 |

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract Sales Price | | 401. Contract Sales Price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to Borrower (Line 1400) | 14,630.26 | 403. | |
| 104. Payoff first mortgage to GMAC MORTGAGE | 137,374.29 | 404. | |
| 105. Payoff second mortgage to REAL PROPERTIES LLC | 42,701.06 | 405. | |
| *Adjustments For Items Paid By Seller in advance* | | *Adjustments For Items Paid By Seller in advance* | |
| 106. City/Town Taxes          to | | 406. City/Town Taxes          to | |
| 107. County Taxes          to | | 407. County Taxes          to | |
| 108. Assessments          to | | 408. Assessments          to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| *120. GROSS AMOUNT DUE FROM BORROWER* | 194,705.61 | *420. GROSS AMOUNT DUE TO SELLER* | |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | | 501. Excess Deposit (See Instructions) | |
| 202. Principal Amount of New Loan(s) | 205,000.00 | 502. Settlement Charges to Seller (Line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first Mortgage | |
| 205. | | 505. Payoff of second Mortgage | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| *Adjustments For Items Unpaid By Seller* | | *Adjustments For Items Unpaid By Seller* | |
| 210. City/Town Taxes          to | | 510. City/Town Taxes          to | |
| 211. County Taxes          to | | 511. County Taxes          to | |
| 212. Assessments          to | | 512. Assessments          to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| *220. TOTAL PAID BY/FOR BORROWER* | 205,000.00 | *520. TOTAL REDUCTION AMOUNT DUE SELLER* | |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600. CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301. Gross Amount Due From Borrower (Line 120) | 194,705.61 | 601. Gross Amount Due To Seller (Line 420) | |
| 302. Less Amount Paid By/For Borrower (Line 220) | ( 205,000.00) | 602. Less Reductions Due Seller (Line 520) | ( |
| *303. CASH ( FROM ) ( X TO ) BORROWER* | 10,294.39 | *603. CASH ( TO ) ( FROM ) SELLER* | 0.00 |

## L. SETTLEMENT CHARGES

| | | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|---|
| **700. TOTAL COMMISSION Based on Price** $ @ 6.0000 % | | | | |
| Division of Commission (line 700) as Follows: | | | | |
| 701. $ to | | | | |
| 702. $ to | | | | |
| 703. Commission Paid at Settlement | | | | |
| 704. | to | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | | |
| 801. Loan Origination Fee % to | | | | |
| 802. Loan Discount % to | | | | |
| 803. Appraisal Fee | to REAL PROPERTY LLC | | 500.00 | |
| 804. BROKER FEE | to AAPEX MORTGAGE CORPORATION | | 4,100.00 | |
| 805. CREDIT REPORT FEE | to AAPEX MORTGAGE CORPORATION | | 11.00 | |
| 806. UNDERWRITING FEE | to FREMONT INVESTMENT & LOAN | | 1,018.00 | |
| 807. TAX SERVICE FEE | to LANDAMERICA | | 48.00 | |
| 808. FLOOD CERT FEE | to LANDAMERICA | | 7.50 | |
| 809. PROCESSING FEE | to AAPEX MORTGAGE CORPORATION | | 495.00 | |
| 810. APPLICATION FEE | to AAPEX MORTGAGE CORPORATION | | 295.00 | |
| 811. YIELD SPREAD PREMIUM | to AAPEX MORTGAGE CORPORATION | POC:4100.00L | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | | |
| 901. Interest From 11/28/06 to 12/01/06 @ $ 52.510000/day ( 3 days %) | | | 157.53 | |
| 902. Mortgage Insurance Premium for months to | | | | |
| 903. Hazard Insurance Premium for 1.0 years to ALLSTATE | | POC:B1401.00 | | |
| 904. | | | | |
| 905. | | | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | | | |
| 1001. Hazard Insurance | months @ $ | per month | | |
| 1002. Mortgage Insurance | months @ $ | per month | | |
| 1003. City/Town Taxes | months @ $ | per month | | |
| 1004. County Taxes | months @ $ | per month | | |
| 1005. Assessments | months @ $ | per month | | |
| 1006. | months @ $ | per month | | |
| 1007. | months @ $ | per month | | |
| 1008. | months @ $ | per month | | |
| **1100. TITLE CHARGES** | | | | |
| 1101. Settlement or Closing Fee | to Tristar Title, LLC | | 50.00 | |
| 1102. Abstract or Title Search | to | | | |
| 1103. Title Examination | to | | | |
| 1104. Title Insurance Binder | to | | | |
| 1105. Document Preparation | to | | | |
| 1106. Notary Fees | to | | | |
| 1107. Attorney's Fees | to | | | |
| (includes above item numbers: | | ) | | |
| 1108. Title Insurance | to TRISTAR TITLE,LLC | | 884.00 | |
| (includes above item numbers: | | ) | | |
| 1109. Lender's Coverage | $ 205,000.00 | | | |
| 1110. Owner's Coverage | $ | | | |
| 1111. IL STATE POLICY FEE | to TICOR TITLE | | 3.00 | |
| 1112. | | | | |
| 1113. | | | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | | |
| 1201. Recording Fees: Deed $ 38.50; Mortgage $ 69.00; Releases $ | | | 107.50 | |
| 1202. City/County Tax/Stamps: Deed ; Mortgage | | | | |
| 1203. State Tax/Stamps: Revenue Stamps ; Mortgage | | | | |
| 1204. RHSP SURCHARGE | to Tristar Title, LLC | | 20.00 | |
| 1205. | | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | | |
| 1301. Survey | to | | | |
| 1302. Pest Inspection | to | | | |
| 1303. | | | | |
| 1304. | | | | |
| 1305. See addit'l disb. exhibit | to | | 6,933.73 | |
| **1400. TOTAL SETTLEMENT CHARGES (Enter on Lines 103, Section J and 502, Section K)** | | | 14,630.26 | |

Tristar Title, LLc
Settlement Agent

Certified to be a true copy.

## ADDITIONAL DISBURSEMENTS EXHIBIT

**Borrower:** KATIE B NEWMAN and JEROME NEWMAN
**Lender:** FREMONT INVESTMENT & LOAN
**Settlement Agent:** Tristar Title, LLC
(630)954-4000
**Place of Settlement:** 1919 S. Highland Ave. Bldg BSte. 330
Lombard, Illinois 60148
**Settlement Date:** November 28, 2006
**Property Location:** 5526 W QUINCY ST
CHICAGO, IL 60644
COOK County, Illinois

| PAYEE/DESCRIPTION | NOTE/REF NO | BORROWER | SELLER |
|---|---|---|---|
| COOK COUNTY CLERK SOLD TAXES | 16-16-106-038-0000 | 6,908.73 | |
| Tristar Title, LLC TI FEE | | 25.00 | |
| **Total Additional Disbursements shown on Line 1305** | | $ **6,933.73** | $ **0.00** |

# EXHIBIT F

OMB NO. 2502-0265

| A. | | B. TYPE OF LOAN: | | | | |
|---|---|---|---|---|---|---|
| **U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT** | | 1. ☐ FHA | 2. ☐ FmHA | 3. ☒ CONV. UNINS. | 4. ☐ VA | 5. ☐ CONV. INS. |
| **SETTLEMENT STATEMENT** | | 6. FILE NUMBER: TTC06-07892 | | | 7. LOAN NUMBER: 30000000695497 | |
| | | 8. MORTGAGE INS CASE NUMBER: | | | | |

C. NOTE: *This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "[POC]" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.*

1.0   3/98   (TTC06-07892.PFD/TTC06-07892/37)

| D. NAME AND ADDRESS OF BORROWER: | E. NAME AND ADDRESS OF SELLER: | F. NAME AND ADDRESS OF LENDER: |
|---|---|---|
| KATIE B NEWMAN and<br>JEROME NEWMAN<br>5526 W QUINCY ST<br>CHICAGO, ILLINOIS  60644 | | FREMONT INVESTMENT & LOAN<br>555 TAXTER RD , SUITE 220<br>ELMSFORD, NY 10523 |

| G. PROPERTY LOCATION: | H. SETTLEMENT AGENT: | I. SETTLEMENT DATE: |
|---|---|---|
| 5526 W QUINCY ST<br>CHICAGO, IL 60644<br>COOK County, Illinois | Tristar Title, LLC<br><br>PLACE OF SETTLEMENT<br>1919 S. Highland Ave. Bldg BSte. 330<br>Lombard, Illinois 60148 | November 28, 2006 |

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101.  Contract Sales Price | | 401.  Contract Sales Price | |
| 102.  Personal Property | | 402.  Personal Property | |
| 103.  Settlement Charges to Borrower (Line 1400) | 21,538.99 | 403. | |
| 104.  Payoff first mortgage to GMAC MORTGAGE | 137,374.29 | 404. | |
| 105.  Payoff second mortgage to REAL PROPERTIES LLC | 42,701.06 | 405. | |
| *Adjustments For Items Paid By Seller in advance* | | *Adjustments For Items Paid By Seller in advance* | |
| 106.  City/Town Taxes              to | | 406.  City/Town Taxes              to | |
| 107.  County Taxes                 to | | 407.  County Taxes                 to | |
| 108.  Assessments                  to | | 408.  Assessments                  to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120.  GROSS AMOUNT DUE FROM BORROWER** | 201,614.34 | **420.  GROSS AMOUNT DUE TO SELLER** | |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201.  Deposit or earnest money | | 501.  Excess Deposit (See Instructions) | |
| 202.  Principal Amount of New Loan(s) | 205,000.00 | 502.  Settlement Charges to Seller (Line 1400) | |
| 203.  Existing loan(s) taken subject to | | 503.  Existing loan(s) taken subject to | |
| 204. | | 504.  Payoff of first Mortgage | |
| 205. | | 505.  Payoff of second Mortgage | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| *Adjustments For Items Unpaid By Seller* | | *Adjustments For Items Unpaid By Seller* | |
| 210.  City/Town Taxes              to | | 510.  City/Town Taxes              to | |
| 211.  County Taxes                 to | | 511.  County Taxes                 to | |
| 212.  Assessments                  to | | 512.  Assessments                  to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220.  TOTAL PAID BY/FOR BORROWER** | 205,000.00 | **520.  TOTAL REDUCTION AMOUNT DUE SELLER** | |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600. CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301.  Gross Amount Due From Borrower (Line 120) | 201,614.34 | 601.  Gross Amount Due To Seller (Line 420) | |
| 302.  Less Amount Paid By/For Borrower (Line 220) | ( 205,000.00 ) | 602.  Less Reductions Due Seller (Line 520) | ( ) |
| **303.  CASH ( FROM ) ( X TO ) BORROWER** | 3,385.66 | **603.  CASH ( TO ) ( FROM ) SELLER** | 0.00 |

## L. SETTLEMENT CHARGES

| | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|
| **700. TOTAL COMMISSION Based on Price** $ @ 6.0000 % | | | |
| *Division of Commission (line 700) as Follows:* | | | |
| 701. $ to | | | |
| 702. $ to | | | |
| 703. Commission Paid at Settlement | | | |
| 704. | to | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | |
| 801. Loan Origination Fee % to | | | |
| 802. Loan Discount % to | | | |
| 803. Appraisal Fee to REAL PROPERTY LLC | | 500.00 | |
| 804. BROKER FEE to AAPEX MORTGAGE CORPORATION | | 4,100.00 | |
| 805. CREDIT REPORT FEE to AAPEX MORTGAGE CORPORATION | | 11.00 | |
| 806. UNDERWRITING FEE to FREMONT INVESTMENT & LOAN | | 1,018.00 | |
| 807. TAX SERVICE FEE to LANDAMERICA | | 48.00 | |
| 808. FLOOD CERT FEE to LANDAMERICA | | 7.50 | |
| 809. PROCESSING FEE to AAPEX MORTGAGE CORPORATION | | 495.00 | |
| 810. APPLICATION FEE to AAPEX MORTGAGE CORPORATION | | 295.00 | |
| 811. YIELD SPREAD PREMIUM to AAPEX MORTGAGE CORPORATION POC:4100.00L | | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | |
| 901. Interest From 11/28/06 to 12/01/06 @ $ 52.510000/day ( 3 days %) | | 157.53 | |
| 902. Mortgage Insurance Premium for months to | | | |
| 903. Hazard Insurance Premium for 1.0 years to ALLSTATE POC:B1401.00 | | | |
| 904. | | | |
| 905. | | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | | |
| 1001. Hazard Insurance months @ $ per month | | | |
| 1002. Mortgage Insurance months @ $ per month | | | |
| 1003. City/Town Taxes months @ $ per month | | | |
| 1004. County Taxes months @ $ per month | | | |
| 1005. Assessments months @ $ per month | | | |
| 1006. months @ $ per month | | | |
| 1007. months @ $ per month | | | |
| 1008. months @ $ per month | | | |
| **1100. TITLE CHARGES** | | | |
| 1101. Settlement or Closing Fee to Tristar Title, LLC | | 50.00 | |
| 1102. Abstract or Title Search to | | | |
| 1103. Title Examination to | | | |
| 1104. Title Insurance Binder to | | | |
| 1105. Document Preparation to | | | |
| 1106. Notary Fees to | | | |
| 1107. Attorney's Fees to ) | | | |
| (includes above item numbers: | | | |
| 1108. Title Insurance to TRISTAR TITLE,LLC ) | | 884.00 | |
| (includes above item numbers: | | | |
| 1109. Lender's Coverage $ 205,000.00 | | | |
| 1110. Owner's Coverage $ | | - | |
| 1111. IL STATE POLICY FEE to TICOR TITLE | | 3.00 | |
| 1112. | | | |
| 1113. | | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | |
| 1201. Recording Fees: Deed $ 38.50; Mortgage $ 69.00; Releases $ | | 107.50 | |
| 1202. City/County Tax/Stamps: Deed ; Mortgage | | | |
| 1203. State Tax/Stamps: Revenue Stamps ; Mortgage | | | |
| 1204. RHSP SURCHARGE to Tristar Title, LLC | | 20.00 | |
| 1205. | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | |
| 1301. Survey to | | | |
| 1302. Pest Inspection to | | | |
| 1303. | | | |
| 1304. | | 13,842.46 | |
| 1305. See addit'l disb. exhibit to | | 21,538.99 | |
| **1400. TOTAL SETTLEMENT CHARGES (Enter on Lines 103, Section J and 502, Section K)** | | | |

Certified to be a true copy.

## ADDITIONAL DISBURSEMENTS EXHIBIT

|  |  |
|---|---|
| **Borrower:** | KATIE B NEWMAN and JEROME NEWMAN |
| **Lender:** | FREMONT INVESTMENT & LOAN |
| **Settlement Agent:** | Tristar Title, LLC |
| | (630)954-4000 |
| **Place of Settlement:** | 1919 S. Highland Ave. Bldg BSte. 330 |
| | Lombard, Illinois 60148 |
| **Settlement Date:** | November 28, 2006 |
| **Property Location:** | 5526 W QUINCY ST |
| | CHICAGO, IL 60644 |
| | COOK County, Illinois |

| PAYEE/DESCRIPTION | NOTE/REF NO | BORROWER | SELLER |
|---|---|---|---|
| COOK COUNTY CLERK<br>SOLD TAXES | 16-16-106-038-0000 | 13,817.46 | |
| Tristar Title, LLC<br>TI FEE | | 25.00 | |
| **Total Additional Disbursements shown on Line 1305** | | $      13,842.46 | $      0.00 |

# EXHIBIT G

| A. | B. TYPE OF LOAN: | | | | |
|---|---|---|---|---|---|
| U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT | 1. ☐ FHA | 2. ☐ FmHA | 3. ☒ CONV. UNINS. | 4. ☐ VA | 5. ☐ CONV. INS. |
| | 6. FILE NUMBER: TTC06-07892 | | | 7. LOAN NUMBER: 30000000695497 | |
| SETTLEMENT STATEMENT | 8. MORTGAGE INS CASE NUMBER: | | | | |

C. NOTE: *This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "[POC]" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.*

1.0   3/98   (TTC06-07892.PFD/TTC06-07892/29)

| D. NAME AND ADDRESS OF BORROWER: | E. NAME AND ADDRESS OF SELLER: | F. NAME AND ADDRESS OF LENDER: |
|---|---|---|
| KATIE B NEWMAN<br>5526 W QUINCY ST<br>CHICAGO, ILLINOIS  60644 | | FREMONT INVESTMENT & LOAN<br>555 TAXTER RD , SUITE 220<br>ELMSFORD, NY 10523 |

| G. PROPERTY LOCATION:<br>5526 W QUINCY ST<br>CHICAGO, IL 60644<br>COOK County, Illinois | H. SETTLEMENT AGENT:<br>Tristar Title, LLC<br><br>PLACE OF SETTLEMENT<br>1919 S. Highland Ave. Bldg BSte. 330<br>Lombard, Illinois 60148 | I. SETTLEMENT DATE:<br><br>November 28, 2006 |
|---|---|---|

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100.  GROSS AMOUNT DUE FROM BORROWER:** | | **400.  GROSS AMOUNT DUE TO SELLER:** | |
| 101.  Contract Sales Price | | 401.  Contract Sales Price | |
| 102.  Personal Property | | 402.  Personal Property | |
| 103.  Settlement Charges to Borrower (Line 1400) | 21,522.99 | 403. | |
| 104.  Payoff first mortgage to GMAC MORTGAGE | 137,374.29 | 404. | |
| 105.  Payoff second mortgage to REAL PROPERTIES LLC | 42,701.06 | 405. | |
| *Adjustments For Items Paid By Seller in advance* | | *Adjustments For Items Paid By Seller in advance* | |
| 106.  City/Town Taxes          to | | 406.  City/Town Taxes          to | |
| 107.  County Taxes          to | | 407.  County Taxes          to | |
| 108.  Assessments          to | | 408.  Assessments          to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120.  GROSS AMOUNT DUE FROM BORROWER** | 201,598.34 | **420.  GROSS AMOUNT DUE TO SELLER** | |
| **200.  AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500.  REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201.  Deposit or earnest money | | 501.  Excess Deposit (See Instructions) | |
| 202.  Principal Amount of New Loan(s) | 205,000.00 | 502.  Settlement Charges to Seller (Line 1400) | |
| 203.  Existing loan(s) taken subject to | | 503.  Existing loan(s) taken subject to | |
| 204. | | 504.  Payoff of first Mortgage | |
| 205. | | 505.  Payoff of second Mortgage | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| *Adjustments For Items Unpaid By Seller* | | *Adjustments For Items Unpaid By Seller* | |
| 210.  City/Town Taxes          to | | 510.  City/Town Taxes          to | |
| 211.  County Taxes          to | | 511.  County Taxes          to | |
| 212.  Assessments          to | | 512.  Assessments          to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220.  TOTAL PAID BY/FOR BORROWER** | 205,000.00 | **520.  TOTAL REDUCTION AMOUNT DUE SELLER** | |
| **300.  CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600.  CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301.  Gross Amount Due From Borrower (Line 120) | 201,598.34 | 601.  Gross Amount Due To Seller (Line 420) | |
| 302.  Less Amount Paid By/For Borrower (Line 220) | ( 205,000.00) | 602.  Less Reductions Due Seller (Line 520) | ( ) |
| **303.  CASH ( FROM ) ( X TO ) BORROWER** | 3,401.66 | **603.  CASH ( TO ) ( FROM ) SELLER** | 0.00 |

The undersigned hereby acknowledge receipt of a completed copy of pages 1&2 of this statement & any attachments referred to herein.
I HAVE CAREFULLY REVIEWED THE HUD-1 SETTLEMENT STATEMENT AND TO THE BEST OF MY KNOWLEDGE AND BELIEF, IT IS A TRUE AND ACCURATE STATEMENT OF ALL RECEIPTS AND DISBURSEMENTS MADE ON MY ACCOUNT OR BY ME IN THIS TRANSACTION. I FURTHER CERTIFY THAT I HAVE RECEIVED A COPY OF THE HUD-1 SETTLEMENT STATEMENT.

Borrower                                                                Seller

    KATIE B NEWMAN

TO THE BEST OF MY KNOWLEDGE, THE HUD-1 SETTLEMENT STATEMENT WHICH I HAVE PREPARED IS A TRUE AND ACCURATE ACCOUNT OF THE FUNDS WHICH WERE RECEIVED AND HAVE BEEN OR WILL BE DISBURSED BY THE UNDERSIGNED AS PART OF THE SETTLEMENT OF THIS TRANSACTION.

    Tristar Title, LLc
    Settlement Agent
WARNING:  IT IS A CRIME TO KNOWINGLY MAKE FALSE STATEMENTS TO THE UNITED STATES ON THIS OR ANY SIMILAR FORM.  PENALTIES UPON CONVICTION CAN INCLUDE A FINE AND IMPRISONMENT.  FOR DETAILS SEE:  TITLE 18 U.S. CODE SECTION 1001 & SECTION 1010.

## L. SETTLEMENT CHARGES

| | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|
| 700. TOTAL COMMISSION Based on Price $ @ 6.0000 % | | | |
| Division of Commission (line 700) as Follows: | | | |
| 701. $ to | | | |
| 702. $ to | | | |
| 703. Commission Paid at Settlement | | | |
| 704. | to | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | |
| 801. Loan Origination Fee % to | | | |
| 802. Loan Discount % to | | | |
| 803. Appraisal Fee to . | | 500.00 | |
| 804. BROKER FEE to AAPEX MORTGAGE CORPORATION | | 4,100.00 | |
| 805. CREDIT REPORT FEE to AAPEX MORTGAGE CORPORATION | | 11.00 | |
| 806. UNDERWRITING FEE to FREMONT INVESTMENT & LOAN | | 1,018.00 | |
| 807. TAX SERVICE FEE to LANDAMERICA | | 48.00 | |
| 808. FLOOD CERT FEE to LANDAMERICA | | 7.50 | |
| 809. PROCESSING FEE to AAPEX MORTGAGE CORPORATION | | 495.00 | |
| 810. APPLICATION FEE to AAPEX MORTGAGE CORPORATION | | 295.00 | |
| 811. YIELD SPREAD PREMIUM to AAPEX MORTGAGE CORPORATION   POC:4100.00L | | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | |
| 901. Interest From 11/28/06 to 12/01/06 @ $ 52.510000/day ( 3 days %) | | 157.53 | |
| 902. Mortgage Insurance Premium for months to | | | |
| 903. Hazard Insurance Premium for 1.0 years to ALLSTATE   POC:B1401.00 | | | |
| 904. | | | |
| 905. | | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | | |
| 1001. Hazard Insurance months @ $ per month | | | |
| 1002. Mortgage Insurance months @ $ per month | | | |
| 1003. City/Town Taxes months @ $ per month | | | |
| 1004. County Taxes months @ $ per month | | | |
| 1005. Assessments months @ $ per month | | | |
| 1006. months @ $ per month | | | |
| 1007. months @ $ per month | | | |
| 1008. months @ $ per month | | | |
| **1100. TITLE CHARGES** | | | |
| 1101. Settlement or Closing Fee to Tristar Title, LLC | | 50.00 | |
| 1102. Abstract or Title Search to | | | |
| 1103. Title Examination to | | | |
| 1104. Title Insurance Binder to | | | |
| 1105. Document Preparation to | | | |
| 1106. Notary Fees to | | | |
| 1107. Attorney's Fees to | | | |
| (includes above item numbers: ) | | | |
| 1108. Title Insurance to TRISTAR TITLE,LLC | | 884.00 | |
| (includes above item numbers: ) | | | |
| 1109. Lender's Coverage $ 205,000.00 | | | |
| 1110. Owner's Coverage $ | | | |
| 1111. IL STATE POLICY FEE to TICOR TITLE | | 3.00 | |
| 1112. | | | |
| 1113. | | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | |
| 1201. Recording Fees: Deed $ 38.50; Mortgage $ 53.00; Releases $ | | 91.50 | |
| 1202. City/County Tax/Stamps: Deed ; Mortgage | | | |
| 1203. State Tax/Stamps: Revenue Stamps ; Mortgage | | | |
| 1204. RHSP SURCHARGE to Tristar Title, LLC | | 20.00 | |
| 1205. | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | |
| 1301. Survey to | | | |
| 1302. Pest Inspection to | | | |
| 1303. | | | |
| 1304. | | | |
| 1305. See addit'l disb. exhibit to | | 13,842.46 | |
| **1400. TOTAL SETTLEMENT CHARGES (Enter on Lines 103, Section J and 502, Section K)** | | 21,522.99 | |

Tristar Title, LLC
Settlement Agent

Certified to be a true copy.

The undersigned hereby acknowledge receipt of a completed copy of pages 1&2 of this statement & any attachments referred to herein.
I HAVE CAREFULLY REVIEWED THE HUD-1 SETTLEMENT STATEMENT AND TO THE BEST OF MY KNOWLEDGE AND BELIEF, IT IS A TRUE AND
ACCURATE STATEMENT OF ALL RECEIPTS AND DISBURSEMENTS MADE ON MY ACCOUNT OR BY ME IN THIS TRANSACTION. I FURTHER CERTIFY
THAT I HAVE RECEIVED A COPY OF THE HUD-1 SETTLEMENT STATEMENT.

Borrower _____    Seller _____
KATIE B NEWMAN

TO THE BEST OF MY KNOWLEDGE, THE HUD-1 SETTLEMENT STATEMENT WHICH I HAVE PREPARED IS A TRUE AND ACCURATE ACCOUNT OF THE
FUNDS WHICH WERE RECEIVED AND HAVE BEEN OR WILL BE DISBURSED BY THE UNDERSIGNED AS PART OF THE SETTLEMENT OF THIS
TRANSACTION.

Tristar Title, LLC
Settlement Agent

WARNING: IT IS A CRIME TO KNOWINGLY MAKE FALSE STATEMENTS TO THE UNITED STATES ON THIS OR ANY SIMILAR FORM. PENALTIES UPON
CONVICTION CAN INCLUDE A FINE AND IMPRISONMENT. FOR DETAILS SEE: TITLE 18 U.S. CODE SECTION 1001 & SECTION 1010.

## ADDITIONAL DISBURSEMENTS EXHIBIT

**Borrower:** KATIE B NEWMAN and JEROME NEWMAN
**Lender:** FREMONT INVESTMENT & LOAN
**Settlement Agent:** Tristar Title, LLC
(630)954-4000
**Place of Settlement:** 1919 S. Highland Ave. Bldg BSte. 330
Lombard, Illinois 60148
**Settlement Date:** November 28, 2006
**Property Location:** 5526 W QUINCY ST
CHICAGO, IL 60644
COOK County, Illinois

| PAYEE/DESCRIPTION | NOTE/REF NO | BORROWER | SELLER |
|---|---|---|---|
| COOK COUNTY CLERK SOLD TAXES | 16-16-106-038-0000 | 13,817.46 | |
| Tristar Title, LLC TI FEE | | 25.00 | |
| **Total Additional Disbursements shown on Line 1305** | | $ 13,842.46 | $ 0.00 |